UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DARLENE TRICE, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:12-202-JMS-DKL |
| | ) | |
| LILLY EMPLOYEE WELFARE PLAN, | ) | |
| *Defendant.* | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Darlene Trice brings this action alleging that Defendant Lilly Employee Welfare

Plan (the "Plan") wrongfully denied her request for long-term-disability benefits in contravention

of the Employee Retirement Income Security Act ("ERISA").[1]  29 U.S.C. § 1001, *et seq*.  Pres-

ently pending before the Court are the parties' cross-motions for summary judgment.  [Dkts. 43;

50.]  For the reasons explained herein, the Court enters summary judgment in favor of the Plan.

## I.
### BACKGROUND

**A.  Ms. Trice's Employment and Disability Coverage**

Ms. Trice was employed as an administrative assistant at Eli Lilly and Company ("Lilly")

from 2000 to 2007.  [R. 57.]  She participated in Lilly's Extended Disability Plan ("EDP") dur-

ing that time.  [R. 59-66.]  The EDP is designed to provide monthly payments to certain Lilly

employees whose active employment terminates, in relevant part, because of the employee's

> inability . . . to engage, for remuneration or profit, in the Employee's own occupa-
> tion for the first twenty-four (24) months following the Disability Date, provided
> that the inability results from the Employee's illness or accidental bodily injury
> and such illness or injury requires the Employee to be under the regular care of a
> Licensed Physician.  After the first twenty-four (24) months following the Disa-
> bility Date, the term "Disability" means the inability of an Employee to engage,

---

[1] The parties agree that the Plan is an "employee welfare benefit plan," such that it is subject to
ERISA.  [Dkts. 44 at 1; 51 at 2.]

for remuneration or profit, in any occupation consistent with the Employee's edu-
cation, training, and experience provided that the inability results from an illness
or accidental bodily injury that requires the Employee to be under the regular care
of a Licensed Physician.

[R. 764.]

The Plan grants Lilly's Employee Benefits Committee ("Benefits Committee") "the dis-

cretion to construe the terms of the Plan and to determine whether an Employee has incurred a

Disability [and] whether the Employee has submitted Objective Medical Evidence . . . ." [R.

786.] It defines "Objective Medical Evidence", in relevant part as

"medical signs" (including psychiatric signs) and "laboratory findings," as docu-
mented by a Licensed Physician regarding disability status. . . . Medical signs are
anatomical, physiological, or psychological abnormalities that can be observed,
apart from subjective statements of symptoms. . . . Psychiatric signs are medical-
ly demonstrable phenomena that indicate specific abnormalities of behavior, af-
fect, thought, memory, orientation, and contact with reality. They must also be
shown by observable facts that can be medically described and evaluated. Labor-
atory findings are anatomical, physiological, or psychological phenomena that can
be shown by the use of medically acceptable laboratory diagnostic techniques.

[R. 770-71.]

A third-party administrator, Anthem Life Insurance Company ("Anthem"), assists with

the disability claims administration. [Dkt. 50-4 at 7-15.] The Benefits Committee ultimately

determines whether a claim is approved or denied. [*See, e.g.*, R. 1580-85.]

**B. Extended Disability Leave Application**

Ms. Trice has a history of joint pain dating back to at least 2004. [R. 445.] She devel-

oped back pain in 2005 and took various leaves of absence from Lilly before she was in a car

accident in July 2007. [R. 18-20, 688.] Ms. Trice applied and was approved for short-term disa-

bility leave between September 2007 and March 2008. [Dkt. 44 at 3 n. 1; R. 71.]

Ms. Trice applied for Extended Disability Leave ("EDL") on April 26, 2008. [R. 67.]

The Plan granted her request and assigned her a disability date of April 1, 2008. [R. 59.]

In May 2010, Anthem requested an update from Ms. Trice on her condition.  [R. 847.] Ms. Trice filled out an activities of daily living questionnaire ("ADL") and informed the Plan that she suffered from various conditions, including disc bulge, arthritis, fibromyalgia, TMJ, chronic fatigue, and depression.  [R. 850.]  She reported that her pain varied from day to day and that she was not dependable.  [*Id.*]  She further informed the Plan that she was taking multiple medications for her conditions.  [*Id.*]

In August 2010, Ms. Trice's treating physician, Susan Holec-Iwasko, D.O., submitted a functional capacity estimate ("FCE").  [R. 848-55, 919-21.]  In the FCE, Dr. Holec-Iwasko rated Ms. Trice's ability to do various activities during an 8-hour workday.  [R. 919.]  Dr. Holec-Iwasko opined, among other things, that Ms. Trice could never push or pull while seated, stoop, crouch, or kneel.  [*Id.*]  She further opined that Ms. Trice was limited in talking and feeling and could never engage in various repetitive actions such as simple grasping, firm grasping, fine manipulation, and reaching. [R. 920.]  She detailed various environmental limitations and noted that Ms. Trice could not sit or stand for more than fifteen minutes at a time, ultimately concluding that Ms. Trice had "reach[ed] maximum medical improvement."  [R. 920-21.]

Anthem requested Dr. Holec-Iwasko's treatment notes, [R. 918], and ordered an independent medical examination ("IME") of Ms. Trice by Dr. Brian Foley, which occurred on October 25, 2010, [R. 15].  Under "Impression/Diagnoses," Dr. Foley remarked that Ms. Trice had "[l]ikely fibromyalgia.  Chronic pain syndrome.  Spinal degenerative disc disease and spondylosis."  [R. 22.]  He noted that there was "no MRI evidence of cervical myelopathy (cord compression)."  [*Id.*]  Dr. Foley concluded that Ms. Trice likely had "diminished work capacity" but that there was "no consistent focal neuromuscular defect seen on exam," that there was "no specific medical evidence to support specific restrictions or limitations," and that sedentary work was not

contraindicated.  [*Id.*]  He also noted that given Ms. Trice's pain, her time off work, and her lack of a plan to return to any employment, he was "not optimistic that she would voluntarily return to gainful employment."  [*Id.*]

On August 26, 2010, the Social Security Administration ("SSA") found Ms. Trice to be disabled for purposes of social security disability benefits.  [R. 354-58.]  The SSA concluded that Ms. Trice was disabled since September 23, 2007, but further noted that "[m]edical improvement is expected with appropriate treatment."[2]  [R. 358.]

The Benefits Committee met on November 10, 2010 to consider, among other things, Ms. Trice's continued eligibility for EDL benefits.  [R. 34.]  On November 15, 2010, Anthem sent Ms. Trice a letter advising her that the Benefits Committee had determined that she did not satisfy the Plan's eligibility requirement and, thus, that her monthly disability benefit was being denied.  [*Id.*]  That termination letter provided, in relevant part, as follows:

> The [Benefits Committee] reviewed the information provided in your file including information from Susan Holec-Wasko [sic], DO, Christopher Doran, MD and Brian Foley, MD.
>
> To evaluate your claim we reviewed Drs. Holec-Wasko [sic] and Doran's medical records which support spinal pain, spondylosis, degenerative disc disease and fibromyalgia syndrome.  However, the records did not provide objective medical evidence to support a severity that would preclude you from working.  To get a better understanding of your current condition, we had you attend an Independent Medical Exam with Brian Foley, MD.  Dr. Foley is Board Certified in Physical Medicine & Rehabilitation and Electro-diagnostic Medicine.  After reviewing your medical records and the examination on October 24, 2010 Dr. Foley did state that you were deconditioned and would likely have diminished work capacity.  However, he also stated, "There is no consistent focal neuromuscular defect seen on exam . . . There is no specific medical evidence to support specific restrictions

---

[2] Ms. Trice notified the Benefits Committee of the SSA's favorable decision with her internal appeal on December 22, 2011.  [R. 87-88.]  That notification attaches the SSA decision and states that it is "contained in Ms. Trice's claim file."  [R. 88.]  Ms. Trice does not point to an earlier date on which she notified the Benefits Committee of the SSA's decision, and the Court will not search the record.  *Stein v. Ashcroft*, 284 F.3d 721, 725 (7th Cir. 2002).

or limitations.   There is no medical contra-indication to performing sedentary work."

While the medical information does indicate that you have some pain symptoms and decrease[d] tolerance of some more vigorous and physically demanding activities, they are not of the severity to prevent you from working.   Please note that the existence of a condition does not in and of itself constitute a disability.

*** 

Based upon its review of the information provided and the applicable Plan provisions, the Committee concluded that there was not information to substantiate the presence of a disability as defined by the Plan.   Accordingly, the Committee determined that you are currently ineligible to continue to receive a monthly disability benefit under the Plan effective 12/1/10.

[R. 34.]

## C.  Internal Appeal and Additional IMEs

Ms. Trice appealed the Benefits Committee's decision to deny her disability benefits, [R. 1577], and in support of her appeal underwent an independent evaluation by rheumatologist Dr. Paul Borgmeier in April 2011, [R. 213-16].  Dr. Borgmeier's impression of Ms. Trice was that she has "[s]evere fibromyalgia symptoms.  Some history of mild degenerative changes in the spine both cervical and lumbar as documented on MRIs.  No significant spinal stenosis or neuroforaminal stenosis on MRIs."  [R. 216.]  He concluded that Ms. Trice was "extremely limited in function" and he opined that he did "not feel that she could be gainfully employed in any work, even of a sedentary nature."  [*Id.*]

In response to Ms. Trice's appeal, the Plan had four physicians look at Ms. Trice's case: two to review her medical records, one to perform a psychiatric medical exam, and one to perform a physical exam.  [R. at 539-48 (Dr. Richard Kaplan - medical records review), 549-55 (Dr. Dayton Dennis Payne - medical records review), 1334-39 (Dr. George F. Parker - psychiatric medical exam report), 1138-53 (Dr. Ralph Buschbacher - physical exam report).]

- 5 -

Dr. Kaplan is board certified in physical medicine, rehabilitation, and pain management. [R. 548.]  He reviewed Ms. Trice's medical records and submitted his report on January 19, 2011.  [R. 539-48.]  Dr. Kaplan concluded that the "objective medical information does not support that [Ms. Trice] is unable to perform any level of work.  To the contrary, there are no specific restrictions or limitations which are supported by the medical records."  [R. 545.]  Dr. Kaplan acknowledged Ms. Trice's "subjective pain dating back at least to 2004," but noted that "[m]ultiple diagnostic studies and imaging studies have been performed with minimal findings." [*Id.*]  Therefore, Dr. Kaplan concluded that "overall the records essentially support the presence of subjective symptoms with no specific functionally significant diagnosis or impairment identified over many years of evaluations.  Thus there are no specific restrictions or limitations which can be identified.  In particular, given this history, a return to at least a sedentary or light occupation full time would be not only possible but also recommended therapeutically."  [R. 546; *see also* R. 547 ("I cannot identify any specific diagnosis, impairment, restrictions, or limitations which would prevent this claimant from performing the duties of a sedentary or light occupation full time.").]

Dr. Payne is board certified in internal medicine and rheumatology.  [R. 555.]  He reviewed Ms. Trice's medical records and submitted his report on January 19, 2011.  [R. 549-55.] Dr. Payne concluded that there was "no objective data . . . to support that there is any impairment in functionality."  [R. 553.]  Dr. Payne noted that the "extensive imaging data of the musculoskeletal system as far back as 2004" revealed "only minimal degenerative changes not out of keeping with age related findings."  [*Id.*]  Thus, Dr. Payne concluded that "[n]o examination findings support any degree of impairment for any level of work."  [*Id.*]  Dr. Payne noted Ms. Trice's subjective pain complaints and acknowledged that the records he reviewed "provide[]

historical features of a chronic musculoskeletal pain syndrome that is consistent with fibromyalgia," but concluded that he was "not able to find any rheumatological disease process or syndrome that would be producing any degree of restrictions or limitations in this case."  [R. 554.]

Dr. Parker is an Associate Professor of Clinical Psychiatry at the Indiana University School of Medicine.  [R. 1340.]  He conducted a psychiatric evaluation of Ms. Trice and submitted his report on May 3, 2011.  [R. 1334.]  He also reviewed Ms. Trice's medical records from Drs. Foley, Kaplan, Payne, and Holec-Iwasko.  [R. 1337.]  After his examination and medical record review, Dr. Parker diagnosed Ms. Trice with major depression and pain disorder associated with psychological factors, chronic.  [R. 1338.]  Dr. Parker noted that Ms. Trice was experiencing significant pain "without substantial evidence of physical injury to explain the pain." [*Id.*]  Dr. Parker noted the onset of Ms. Trice's pain at the time of the death of two close friends and an important change in her role at work "strongly suggests that psychological issues played a major role in the onset of Ms. Trice's pain."  [*Id.*]  He concluded that the persistence of her pain "is likely related to the subsequent development of depression and anxiety" and that "[i]t is important to note that people with pain disorder do experience pain; i.e., the pain is not malingered, but it is quite disproportionate to any underlying physical injury."  [*Id.*]  Dr. Parker noted how pain disorders are typically treated and concluded that while "Ms. Trice's functional impairments appear to limit her from performing her previous occupational duties as an administrative assistant . . . regular activity, including work, is recommended as part of the management of pain disorder."  [R. 1338-39.]

On May 20, 2011, Anthem forwarded Dr. Parker's report to the Plan, noting that "it may allow them to make a decision on [Ms. Trice's] limitations and avoid additional examinations."

[R. 1333.]  Anthem noted that a physical medical examination was scheduled "but we have time to cancel it if it is determined that it is not needed."  [*Id.*]

The previously scheduled medical examination was not canceled and was performed by Dr. Buschbacher.  [R.1138.]  Dr. Buschbacher is board certified in physical medicine, rehabilitation, and electrodiagnostic medicine and is also a professor at the Department of Physical Medicine and Rehabilitation at Indiana University.  [R. 1153.]  He conducted an IME by reviewing Ms. Trice's medical records and by physically examining her.  [R. 1138-50.]  Dr. Buschbacher submitted a report on October 14, 2011.  [R. 1138.]  He noted under "physical examination" that Ms. Trice's "examination is basically invalid."  [R. 1152.]  After detailing specifics regarding the examination, Dr. Buschbacher opined as follows:

1. In my opinion, Ms. Trice's presentation is consistent with a psychiatric disorder rather than any physical condition.  Her examination is unremarkable aside from pain behavior.  There is nothing objective that I can detect that is abnormal.  She has had extensive testing, and this also is unrevealing for any specific musculoskeletal or physical diagnoses.

2. In my opinion, there is no physical condition supported by the examination and clinical evidence that is functionally impairing.

3. In my opinion, there is no limitation or restriction that would result in an inability of Ms. Trice to perform any occupational duties for which she is qualified based on her vocational assessment.  In particular, there is no physical limitation that would preclude her from working as an administrative assistant.

4. Ms. Trice does have significant inconsistencies in her examination.  She is intermittently tender in various areas.  She has significant pain behaviors.  I would highly recommend further psychiatric treatment.  I do not think any further interventions such as physical therapy, injections, etc. would be likely to help her.

[R. 1152-53.]

The Benefits Committee met on December 16, 2011 and evaluated, among other things, Ms. Trice's appeal.  [R. 1583-84.]  The relevant portion of the minutes from that meeting state as follows:

> The Committee reviewed the information provided by the participant, medical documentation and related information.  The Committee discussed various materials provided to the Committee, including a summary of the Independent Medical Evaluation ("IME") report [of Dr. Buschbacher] from October 14, 2011 that states there is no clinical evidence supported by the examination that demonstrates functional impairment.  Based on its discussion, review of materials provided to the Committee and the application of the relevant provisions of the Lilly Extended Disability Plan, the Committee denied the appeal.

[R. 1584.]

Ms. Trice asked the Benefits Committee to reconsider its denial of her appeal and submitted a response to Dr. Buschbacher's report from Dr. Holec-Iwasko, one of Ms. Trice's doctors. [R. 108-09, 126.]   Dr. Holec-Iwasko opined that Ms. Trice was disabled under the any-occupation definition in the Plan and noted that "very often in fibromyalgia you have little more than symptomology including tender points to make your diagnostic assessment." [R. 108, 126.] Dr. Holec-Iwasko concluded that Ms. Trice "has classic fibromyalgia," that her "pain is consistent" and that counseling "can also help with her anxiety and depression over her disability." [R. 126.]

The Benefits Committee met again on January 23, 2012, and denied Ms. Trice's request for reconsideration after reviewing the information she provided, including newly submitted medical documentation and related information.  [R. 1580-82.]

On February 6, 2012, the Plan, through Anthem, notified Ms. Trice by letter that the appeal of the denial of her disability benefits had been denied.  [R. 949-51.]  It noted that medical records from Drs. Holec-Iwasko, Doran, and Foley had initially been reviewed but that "the records did not provide medical evidence to support symptoms of a severity that would preclude

you from working." [R. 950.] As part of the evaluation of Ms. Trice's appeal, it noted the findings of Dr. Payne, Dr. Kaplan, Dr. Parker, and Dr. Buschbacher. [R. 950-51.] It acknowledged the medical records of Drs. Holec-Iwasko and Doran, but concluded that "[b]ased on all of the information described above, the Committee concluded that [Ms. Trice was] not disabled under the terms of the Plan." [R. 951.]

### D. Procedural History

On February 16, 2012, Ms. Trice filed this ERISA action against the Plan in this Court. [Dkt. 1.] Ms. Trice alleges, among other things, that the Plan terminated her long-term disability benefits intentionally and without reasonable justification in violation of ERISA after she provided ample medical evidence to verify her disability under the terms of the Plan. [*Id.* at 4.] Ms. Trice and the Plan have filed cross-motions for summary judgment supporting their positions, and those motions are now ripe for a decision. [Dkts. 43; 50.]

## II.
### STANDARD OF REVIEW

In this case, the Plan grants Lilly's Benefits Committee "the discretion to construe the terms of the Plan and to determine whether an Employee has incurred a Disability [and] whether the Employee has submitted Objective Medical Evidence . . . ." [R. 786.] Both parties acknowledge the discretionary authority that the Plan gives the Benefits Committee. [Dkts. 44 at 16; 51 at 2.] Therefore, under these circumstances, the Court applies a deferential standard,

seeking to determine only whether the administrator's decision was "arbitrary and capricious."[3]

*Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).   Under this review, the

Court will uphold a decision "as long as (1) it is possible to offer a reasoned explanation, based

on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation

of relevant plan documents, or (3) the administrator has based its decision on a consideration of

the relevant factors that encompass the important aspects of the problem."   *Cerentano v. UMWA*

*Health & Ret. Funds*, --- F.3d ---, 2013 WL 6144759 (7th Cir. 2013) (citing *Tompkins v. Cent.*

*Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013)).   Review under this deferential

standard is not a rubber stamp, however, and the Court "will not uphold a termination [of bene-

fits] when there is an absence of reasoning in the record to support it."   *Holmstrom*, 615 F.3d at

766.

   "When challenged in court, the plan administrator can defend his interpretation with any

arguments that bear upon its rationality."   *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir.

1996).   It "is not limited to repeating what [it] told the applicant."   *Id.*   It must give the applicant

the reason for the denial of benefits, but it "does not have to explain to him why it is a *good* rea-

son."   *Id.* (original emphasis).   "To require that would turn plan administrators not just into arbi-

---

[3] This standard is synonymous with abuse of discretion.  *Holmstrom*, 615 F.3d at 767 n.7.   The
Plan cites case law stating that an administrator's decision stands unless it is "downright unrea-
sonable."   [Dkt. 51 at 20 (citation omitted).]   As Ms. Trice notes in her response, however, the
Seventh Circuit has explained that although that phrase has sometimes been used to describe the
arbitrary-and-capricious standard of review in these cases, it "should not be understood as requir-
ing a plaintiff to show that only a person who had lost complete touch with reality would have
denied benefits."   [Dkt. 52 at 5 (citing *Holmstrom*, 615 at 766 n.5).]   "Rather, the phrase is mere-
ly a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in
ways that include focus on procedural regularity, substantive merit, and faithful execution of fi-
duciary duties."   *Holmstrom*, 615 F.3d at 766 n.5.   Therefore, regardless of whether or not the
Court uses the phrase "downright unreasonable," which it does not in this decision, the arbitrary-
and-capricious standard remains the same.

trators, for arbitrators are not usually required to justify their decisions, but into judges, who are." *Id.*

It is not enough to simply disagree with an administrator's decision concerning benefits. *Ruiz v. Cont. Cas. Co.*, 400 F.3d 986, 992 (7th Cir. 2005). It is "not [the Court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority." *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (citation omitted). Instead, "[i]f the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final." *Id.*; *see also Green v. UPS Health & Welfare Package for Retired Employees*, 595 F.3d 734, 738 (7th Cir. 2010) (noting that the fiduciary's decision "is not arbitrary and capricious if it falls within the range of reasonable interpretations").

Although the parties filed cross-motions for summary judgment, the Court will apply the deferential standard of review detailed herein, not the traditional summary judgment standard, as is appropriate for the review of a denial of disability benefits. *See Holmstrom*, 615 F.3d at 766 (applying deferential standard of review without reference to traditional summary judgment analysis in disability benefits review); *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 575-76 (7th Cir. 2006) (same).

## III.
### DISCUSSION

Ms. Trice makes numerous challenges to the Plan's decision to deny her benefits, but her two main arguments are that the Plan failed to provide her claim with a full and fair review and that its inherent conflict of interest as both the plan administrator and insurer unfairly affected the claims review process. The Court will address each of these overarching arguments in turn, along with Ms. Trice's more specific arguments regarding the Plan's alleged errors.

### A.  Full and Fair Review

Ms. Trice's main argument is that the Plan failed to give her claim a full and fair review, as is required by ERISA.  [Dkt. 44 at 19-29.]  Ms. Trice cites various portions of the record that she contends the Plan either ignored or mischaracterized.  [*Id.* at 19-23.]  She also faults the Plan for concluding that she did not present objective medical evidence and for not considering the Social Security Administration's conclusion that she is disabled.  [*Id.* at 24-29.]

The Plan responds by conceding the conflicting nature of evidence in the record, but it argues that it provided Ms. Trice's claim full and fair review, allowed Ms. Trice to submit additional evidence on numerous occasions, and had independent physicians review her claim.  [Dkt. 51 at 20-21.]  It contends that the weight of the conflicting evidence supports its rational decision to deny Ms. Trice's claim.  [*Id.* at 21-25.]  The Plan also specifically disputes Ms. Trice's arguments that it ignored or mischaracterized evidence.  [*Id.* at 25-35.]

In her reply, Ms. Trice claims that most of the doctors who physically examined her found her to be disabled.  [Dkt. 52 at 1-2.]  She criticizes the Plan's decision to deny her benefits based on the opinions of doctors who only reviewed her medical records.  [*Id.*]  Ms. Trice "submits that the five-physician review is probative only of the Plan's unshakeable commitment to denying any claim that it cannot verify through lab tests or X-rays."  [*Id.* at 2.]  Ms. Trice points to the Plan's final denial letter, which she claims emphasized that it was denying her benefits request because objective medical evidence could not confirm that she was disabled.  [*Id.* at 6-7.]

#### 1)  Standards Governing Review

Given various arguments and insinuations in Ms. Trice's briefs, it is necessary to set forth the relevant standards governing the Plan's review of her disability claim.

First, under ERISA, a treating physician's opinions are not entitled to more deference than the opinions of physicians that the administrator hired.  *Black & Decker Disability Plan v.*

*Nord,* 538 U.S. 822, 833-34 (2003).  Plan administrators may not, of course, arbitrarily refuse to credit a claimant's reliable evidence, but "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id.*

Second, even if a claimant's treating physicians reach different conclusions regarding the claimant's abilities, under the arbitrary-and-capricious standard, the Court will not "attempt to make a determination between competing expert opinions."  *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006).  Instead, an "insurer's decision prevails if it has rational support in the record."  *Id.*

Third, the Plan's decision to "seek independent expert advice is evidence of a thorough investigation."  *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006).  Thus, contrary to Ms. Trice's assertion, the Plan's decision to engage five independent medical examiners is not evidence of an "unshakeable commitment" to deny her claim.[4]  [Dkt. 52 at 2.]

Fourth, there is no authority that prohibits "'the commonplace practice of doctors arriving at professional opinions after reviewing medical files.'"  *Leger v. Tribune Co. Term Dis. Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009) (quoting *Davis*, 444 F.3d at 577).  Doctors are fully able

---

[4] The Court disagrees with Ms. Trice's unreasonable interpretation of a letter that third-party administrator Anthem sent to the Plan attaching the fourth IME (Dr. Parker's) and asking if the Plan wanted to cancel the fifth IME.  [Dkt. 44 at 10-11, 30-31.]  Ms. Trice contends that Anthem's letter is evidence that it felt that Dr. Parker's IME "was sufficient to support a disability determination such that the additional physical IME was not warranted."  [*Id.* at 31.]  But this argument ignores the plain language of Anthem's letter and Dr. Parker's conclusions.  The letter does nothing more than attach Dr. Parker's report and ask the Plan if it wants to continue with the fifth IME, as previously scheduled.  [R. 1333.]  In fact, given that Dr. Parker diagnosed Ms. Trice with the psychological disorders of major depression and chronic pain syndrome and concluded that work is recommended as part of the management of a pain disorder, [R. 1338-39]— conclusions that weigh in favor of *denying* Ms. Trice's disability claim—Ms. Trice's interpretation of Anthem's letter is unreasonable.

to evaluate medical information from file reviews, balance the objective data against the subjective opinions of the treating physicians, and render an opinion without direct consultation with the claimant. *Id*. Therefore, the Seventh Circuit has held it to be reasonable for a plan administrator to rely on its doctors' assessments of a claimant's files to form an opinion, which saves the plan the financial burden of conducting repetitive tests and examinations. *Id.* Accordingly, Ms. Trice's insinuation that the Plan should not have relied on the opinions of medical professionals who examined her medical records but did not physically examine her is legally unsupported. [Dkt. 44 at 22 (criticizing the reports of two physicians "who simply reviewed Ms. Trice's records but never examined or interviewed Ms. Trice").]

Fifth, Ms. Trice correctly notes that fibromyalgia, which is a rheumatic disease, cannot be confirmed by objective laboratory tests. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (citing *Sarchet v. Chater,* 78 F.3d 305, 306-07 (7th Cir. 1996)). But she ignores Seventh Circuit case law emphasizing that "[a] distinction exists however, between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured[,]" *Holmstrom*, 615 F.3d at 770 (citing *Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 322 (7th Cir. 2007)). Thus, it is not enough that some doctors have diagnosed Ms. Trice with a potentially disabling condition such as fibromyalgia.[5] *See*

---

[5] Accordingly, the Court rejects Ms. Trice's arguments criticizing the Plan's decision to the extent that she argues that the Plan arbitrarily ignored some of the doctor's diagnoses or lack thereof. [Dkt. 44 at 21 (arguing that the Plan arbitrarily discounted Dr. Foley's fibromyalgia diagnosis), 21 (arguing that the Plan erred by ignoring Dr. Borgmeier's fibromyalgia diagnosis), 22-23 (criticizing the reports of Drs. Payne and Kaplan for not "render[ing] any opinion whatsoever on Mr. Trice's fibromyalgia, depression, pain or fatigue")], 23 (criticizing the Plan's focus on a statement in Dr. Parker's report that work is recommended for treatment of a chronic pain disorder (which was Dr. Parker's diagnosis) while simultaneously claiming that Dr. Parker diagnosed Ms. Trice with fibromyalgia).]

*Hawkins*, 326 F.3d at 916 ("'Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the claimant] is one of the minority.'") (quoting *Sarchet*, 78 F.3d at 306-07). Instead, in determining whether the Plan's decision is supported by a reasonable explanation of the evidence, the Court must focus on the evidence regarding whether Ms. Trice's subjective pain limits her objective functional capabilities. *Holmstrom*, 615 F.3d at 770 ("The district court correctly identified this distinction and focused on it."). Accordingly, the Court rejects Ms. Trice's argument to the extent she argues that the Plan insisted on "clinical data that does not exist in medicine" to support her pain.[6] [Dkt. 44 at 24-28.]

---

[6] Ms. Trice accuses the Plan of misrepresenting evidence in the record on various occasions, but this section of her argument contains significant distortions. For example, Ms. Trice argues that "none of the physicians who examined her questioned the diagnoses of fibromyalgia and severe depression . . . and, of equal importance, none of the physicians who examined Ms. Trice found her to be fabricating the pain she suffers as a result of these combined conditions. Likewise, and most importantly, *none of the physicians who examined Ms. Trice doubted that she is functionally impaired.*" [Dkt. 44 at 27 (original emphasis).] Dr. Parker physically examined Ms. Trice and did not diagnose her with fibromyalgia. Fibromyalgia is a rheumatic disease, *Sarchet*, 78 F.3d at 307, but Dr. Parker, a psychiatrist, diagnosed her with major depression and pain disorder associated with psychological factors, chronic. [R. 1338.] With regard to the latter diagnosis, Dr. Parker specifically noted that "psychological issues played a major role in the onset of Ms. Trice's pain." [*Id.*] While that pain is not malingered, Dr. Parker directly attributed it to a psychological pain disorder, not fibromyalgia, and concluded that "regular activity, including work, is recommended as part of the management of pain disorder." [R. 1339.] Dr. Buschbacher physically examined Ms. Trice and noted "significant inconsistencies," including that "[s]he is intermittently tender in various areas," ultimately concluding that in his opinion, her "presentation is consistent with a psychiatric disorder rather than any physical condition." [R. 1152-53.] Dr. Buschbacher's opinion belies Ms. Trice's assertion that "the record does not contain a single opinion that doubts Ms. Trice's credibility and good faith." [Dkt. 44 at 28.] Dr. Buschbacher ultimately concluded that he could not identify any functional limitations that would prevent Ms. Trice from performing the duties of a sedentary or light occupation full time. [R. 548.] This also contradicts Ms. Trice's assertion that no doctor who physically examined her doubted that she is functionally impaired.

*2)   Decision Supported by a Reasonable Explanation of the Evidence*

With these principles and the arbitrary-and-capricious standard of review in mind, the Court first will determine whether the Plan's decision is supported by a reasonable explanation of the evidence in the record.  If it is, the Court will address Ms. Trice's arguments regarding the Plan's alleged omissions and misrepresentations.

To remain eligible for disability benefits after March 31, 2010, Ms. Trice had to satisfy the Plan's more stringent "any occupation" disability standard.  [R. 764 (defining "disability" after the first 24 months following the disability date to mean "the inability of an Employee to engage, for remuneration or profit, in any occupation consistent with the Employee's education, training, and experience . . .").]  The Plan concedes that there is conflicting evidence in the record but contends that it made a rational decision regarding this evidence.  [Dkt. 51 at 21-25.] The Plan provides a chart summarizing the evidence regarding Ms. Trice's ability to perform any occupation:

| Trice *Can* Engage in Her or Any Occupation | Trice *Can* Engage in Occupations Other Than Her Own | Trice *Cannot* Engage In Any Occupation |
|---|---|---|
| Dr. Foley - "There is no medical contra-indication to Trice's ability to perform sedentary work." | Dr. Parker - "[R]egular activity, including work, is recommended as part of the management of pain disorder." | Dr. Holec-Iwasko |
| Dr. Kaplan - "[A] return to sedentary or light occupation full time would be not only possible but also recommended therapeutically." | | Dr. Borgmeier |
| Dr. Payne – "[U]nrestricted work would be the claimant's expected capabilities." | | Dr. Grannis – therapy could increase her functional capacity so "she can be back to employment." |
| Dr. Buschbacher - "[T]here is no limitation or restriction that would result in an inability of Ms. Trice to perform any occupational duties for which she is qualified…." | | |

[Dkt. 51 at 25.]

In its letter denying Ms. Trice's appeal of the denial of continued benefits, the Plan cited evidence in the record supporting its decision. The Court will start with the evidence cited by the Plan in that letter, given that it had a duty to convey the basis of its decision to Ms. Trice. *See Holmstrom*, 615 F.3d at 766 (noting that ERISA "requires that specific reasons for denial be communicated to the claimant. . .") (citation omitted).

First, the Plan cited a report by Dr. Foley, an IME who is board certified in physical medicine and rehabilitation. [R. 950, 15-32.] Dr. Foley concluded that there is "no specific medical evidence to support specific restrictions or limitations. There is no medical contra-indication to perform sedentary work." [R. 22.] Ms. Trice argues that the Plan's denial arbitrarily ignores that Dr. Foley concluded that she had a "diminished work capacity." [Dkt. 44 at 21.] But although Dr. Foley found a diminished work capacity, he expressly concluded that she had "no" limita-

tions and restrictions that would result in the inability to perform her own occupation or any oc-

cupation. [R. 25.] Thus, Dr. Foley's report supports the Plan's decision.

Second, the Plan cited a report from Dr. Payne, an IME who is board certified in internal

medicine and rheumatology. [R. 950, 549-55.] Dr. Payne detailed Ms. Trice's treatment history

and the medical records and concluded that although the information he reviewed "is consistent

with fibromyalgia," "[n]o examination findings support any degree of impairment for any level

of work." [R. 553-54.] He specifically noted that Ms. Trice's examinations "also do not reveal

any specific findings that would be expected to impact her functionality" and that "[t]herefore,

unrestricted work would be the claimant's expected capabilities." [R. 554.]

Third, the Plan cited a report from Dr. Kaplan,[7] an IME who is board certified in physical

medicine and rehabilitation/pain. [R. 950, 539-48.] Dr. Kaplan noted that the office records of

Dr. Holec-Iwasko, Ms. Trice's treating physician, "are predominately handwritten and only par-

tially legible." [R. 544.] Dr. Kaplan noted that he could not identify a specific physical exami-

nation. [*Id.*] Dr. Kaplan ultimately concluded that the objective medical evidence did not sup-

port any specific restrictions or limitations supported by the medical records. [R. 545.] Dr.

---

[7] Both parties take a misguided swipe at each other's experts. Ms. Trice tries to persuade this Court to discount the opinions of Dr. Kaplan and Dr. Payne because "other courts have repeatedly found plans' reliance on both Dr. Kaplan's opinion and Dr. Payne's opinion to be arbitrary and capricious" when they judge a patient's credibility off a review of medical records. [Dkt. 52 at 8-9.] Ms. Trice does not point to anything in Dr. Kaplan's or Dr. Payne's reports judging her credibility. In fact, both doctors acknowledged Ms. Trice's pain but concluded that there was no objective evidence in the record supporting functional limitations precluding work. [R. 548 (Dr. Kaplan noting the "history of an ongoing multifocal pain syndrome" but "no specific objective impairment factors"); 554 (Dr. Payne noting symptoms "consistent with fibromyalgia" but no "specific findings that would be expected to impact the claimant's functionality").] Thus, the Court rejects Ms. Trice's argument. Likewise, the Court rejects the Plan's argument comparing this case to *St. Clare v. Unum Life Ins. Co. of Am.*, 2012 WL 1666619 (S.D. Ind. 2012), where the medical acceptability of Dr. Holec-Iwasko's medical treatment was at issue. [Dkt. 51 at 26-27.] The Plan does not challenge the medical acceptability of Ms. Trice's treatment; thus, reliance on *St. Clare* is misplaced.

Kaplan further noted that Dr. Holec-Iwasko's disability forms for Ms. Trice did not document a physical examination. [R. 546.] Dr. Kaplan ultimately concluded that because no specific restrictions or limitations could be identified, "a return to at least sedentary or light occupation full time would be not only possible but also recommended therapeutically." [R. 546.]

Fourth, the Plan cited a report from Dr. Parker, an Associate Professor of Psychiatry at Indiana University, who conducted an IME. [R. 950-51, R. 1334-39.] Dr. Parker reviewed Ms. Trice's records and interviewed her. [R. 1334.] Based on his review, Dr. Parker diagnosed Ms. Trice with major depression and pain disorder associated with psychological factors, chronic.[8] [R. 1338.] Dr. Parker noted the onset of Ms. Trice's pain at the time of the death of two close friends and an important change in her role at work "strongly suggests that psychological issues played a major role in the onset of Ms. Trice's pain." [Id.] He concluded that the persistence of her pain "is likely related to the subsequent development of depression and anxiety" and that "[i]t is important to note that people with pain disorder do experience pain; i.e., the pain is not malingered, but it is quite disproportionate to any underlying physical injury." [Id.] Dr. Parker noted how pain disorders are typically treated and concluded that while "Ms. Trice's functional impairments appear to limit her from performing her previous occupational duties as an adminis-

---

[8] Ms. Trice argues that "the bulk of Dr. Parker's report details his diagnosis of Ms. Trice with fibromyalgia and severe depression . . . ." [Dkt. 44 at 23; see also id. at 21 ("Dr. Parker's evaluation makes clear that he believes that Ms. Trice is seriously limited in her functional abilities as a result of the inseparable conditions of fibromyalgia and severe depression").] While Ms. Trice accuses the Plan of mischaracterizing the record at various times in its denial letter and brief, the Court finds Ms. Trice's argument on this point to be the most egregious example of record mischaracterization in this case. Fibromyalgia is a rheumatic disease, Sarchet, 78 F.3d at 307, but Dr. Parker, a psychiatrist, diagnosed her with major depression and pain disorder associated with psychological factors, chronic, [R. 1338]. Dr. Parker specifically noted that "psychological issues played a major role in the onset of Ms. Trice's pain." [Id.] While that pain is not malingered, Dr. Parker directly attributed it to a psychological pain disorder, not fibromyalgia, and concluded that "regular activity, including work, is recommended as part of the management of pain disorder." [R. 1339.] Ms. Trice's arguments to the contrary directly contravene Dr. Parker's report.

trative assistant . . . regular activity, including work, is recommended as part of the management of pain disorder."  [R. 1338-39.]

Fifth, the Plan cited an IME report by Dr. Buschbacher, who is board certified in physical medicine, rehabilitation, and electrodiagnostic medicine and is also a professor at the Department of Physical Medicine and Rehabilitation at Indiana University.  [R. 951, 1153.]  He reviewed Ms. Trice's medical records and performed a physical examination.  [R. 1138-50.]  Dr. Buschbacher noted under "physical examination" that Ms. Trice's "examination is basically invalid."  [R. 1152.]  Ms. Trice uses this comment as a springboard to argue that the Plan erred by relying on Dr. Buschbacher's report to reach its decision.  [Dkt. 44 at 23.]  While it is not clear exactly what Dr. Buschbacher meant by that comment, it appears to be a reference to his ultimate conclusion that "[i]n my opinion, Ms. Trice's presentation is consistent with a psychiatric disorder rather than a physical condition.  Her examination is unremarkable aside from pain behavior."  [R. 1152-53, *see also id.* 1153 (noting "significant inconsistencies in [Ms. Trice's] examination").] What is clear is that despite Dr. Buschbacher's comment that the physical examination was "basically invalid," he possessed enough information to assess Ms. Trice and ultimately conclude that "there is no limitation or restriction that would result in an inability of Ms. Trice to perform any occupational duties for which she is qualified based on her vocational assessment.  In particular, there is no physical limitation that would preclude her from working as an administrative assistant."  [R. 1153.]  Thus, the Court rejects Ms. Trice's argument that the Plan erred by relying on Dr. Buschbacher's report because he stated that her physical exam was "basically invalid."  [Dkt. 44 at 23.]

Not only did the Plan cite the evidence that supported its decision in the denial letter, it also recognized that Ms. Trice had presented evidence from treating physicians, including Dr.

Holec-Iwasko and Dr. Doran.  [R. 950.]  The Plan noted that the medical records from those doctors supported some of Ms. Trice's symptoms of spinal pain, spondylosis, degenerative disc disease, and fibromyalgia, but it concluded that the records "did not provide medical evidence to support symptoms of a severity that would preclude you from working."  [*Id.*]  Additionally, as detailed above, the Plan relied in part on the IME of Dr. Kaplan, who noted that the office records of Dr. Holec-Iwasko "are predominately handwritten and only partially legible."  [R. 544.]  Dr. Kaplan further noted that he could not identify a specific physical examination and that Dr. Holec-Iwasko's disability forms did not document a physical examination.  [R. 546.]

Based on its review of the record in light of the parties' arguments, the Court concludes that the Plan's decision to deny Ms. Trice disability benefits has rational support in the record.  Specifically, Drs. Foley, Kaplan, Payne, Parker, and Buschbacher reviewed Ms. Trice's records and, in some cases, physically examined Ms. Trice and concluded that there was not objective evidence supporting the functional limitations she claimed.  Although Ms. Trice's treating physicians reached different conclusions, "under an arbitrary and capricious review, neither [the Seventh Circuit Court of Appeals], nor the district court, will attempt to make a determination between competing expert opinions."  *Semien*, 436 F.3d at 812.  Instead, an "insurer's decision prevails if it has rational support in the record."  *Id.*  The Court concludes that the decision denying Ms. Trice disability benefits has such rational support in the record in this case.

### 3)  *Allegedly Ignored Evidence*

Although the Court has concluded that the denial of Ms. Trice's disability benefits has rational support in the record, it still must address her arguments that the Plan arbitrarily and capriciously ignored certain evidence that was favorable to her.  [Dkt. 44 at 20-21, 29.]

a)  Dr. Holec-Iwasko's FCE

Ms. Trice argues that the Plan's denial gives no explanation for dismissing Dr. Holec-Iwasko's August 9, 2010 FCE and her December 19, 2011 physician's statement, both of which opine that Ms. Trice's symptoms are severe enough to preclude her from working.  [Dkt. 44 at 20.]

The Plan points out that both Drs. Kaplan and Payne observed that Dr. Holec-Iwasko gave opinions without documenting any physical examinations in support of those opinions. [Dkt. 51 at 26.]  It points to statements in the letter denying Ms. Trice's appeal to show that this rationale was embraced by the Plan.  [*Id.* at 28 (citing R. 950).]

Ms. Trice replies that the Plan's argument "strains credibility" because Dr. Holec-Iwasko was Ms. Trice's treating physician for years and medical records were also part of the record. [Dkt. 52 at 9-10.]

The Court agrees with the position set forth in the Plan's reply.  [Dkt. 53 at 5.]  It is undisputed that there is conflicting evidence in the record regarding both Ms. Trice's diagnosis and any resulting functional impairments.  While Dr. Holec-Iwasko completed an FCE for Ms. Trice in August 2010, it contains little explanation regarding Ms. Trice's functionality or supporting physical exams.  [R. 127-29.]  Likewise, the December 19, 2011 physician's statement contains a few handwritten notes from a patient visit but does not reflect a comprehensive supporting exam. While Ms. Trice argues that Dr. Holec-Iwasko's medical records were part of the record and show comprehensive medical exams, she fails to cite anything from the record supporting that argument.  Finally, the denial letter expressly cited Dr. Kaplan's conclusion that Dr. Holec-Iwasko's August 2010 report "noted you had limitations but no examination findings were identified."  [R. 950.]  This shows that the Plan acknowledged Dr. Holec-Iwasko's report but, in-

stead, relied on the findings of another expert.  Again, under an arbitrary and capricious review, this Court will not attempt to make a determination between competing expert opinions.  *Semien*, 436 F.3d at 812.   Therefore, the Court rejects Ms. Trice's arguments regarding Dr. Holec-Iwasko's opinion.

>                    b)  Dr. Borgmeier's Report

Ms. Trice emphasizes that the Plan's denial completely ignores Dr. Borgmeier's April 26, 2011 report that opines that Ms. Trice cannot engage in gainful employment.  [Dkt. 44 at 21.] She argues that this shows that its review was arbitrary and capricious.  [*Id.* at 20.]

The Plan points out that Dr. Borgmeier's report is contrary to the reports of Drs. Foley, Payne, Kaplan, and Buschbacher and that there is no evidence that Dr. Borgmeier considered any of the evidence that undermined Ms. Trice's claim.  [Dkt. 51 at 28-30.]  It points out that it has no discrete burden to explain why it credited certain opinions over others and emphasizes that it gave a satisfactory explanation for its denial based on other evidence in the record.  [*Id.* at 29.]

In her reply, Ms. Trice questions the Plan's decision not to acknowledge Dr. Borgmeier's report because he is a rheumatologist who physically examined her and concluded that she could not work.  [Dkt. 52 at 10.]  She contends that Dr. Borgmeier's report is the best evidence of her disability and should not have been ignored.  [*Id.*]

"A satisfactory explanation is one that gives the specific reasons for the denial, but it need not explain the reasoning behind the reasons, that is, the interpretive process that generated the reason for the denial."  *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (citation omitted); *see also Nord*, 538 U.S. at 834 (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit

reliable evidence that conflicts with a treating physician's evaluation").  Applying these standards, courts have rejected a claimant's argument that a plan administrator who clearly credits substantial evidence conflicting with the claimant's evidence had a duty to explain why it rejected the claimant's evidence.  *See, e.g.*, *Beamon v. Unum Life Ins. Co. of Am.*, 2005 WL 1115860, *16 (S.D. Ind. 2005) ("In this case, Unum clearly credited the substantial evidence that conflicted with [the claimant's physician's] diagnosis; there was no further duty on Unum's part to explain why it rejected [that doctor's] opinions, and we decline to adopt a stricter standard of review than that which is widely applied by other courts in these circumstances that would undermine Unum's decision to terminate benefits.").

Here, the Plan gave a satisfactory explanation based on a reasonable interpretation of evidence in the record for why it denied Ms. Trice's disability claim.  Based on the case law cited above, the Plan had no duty to explain the reasoning behind the interpretive process, and as the Court detailed at length in Part III.A.2, *supra*, there was substantial evidence in the record supporting the Plan's decision to deny benefits.  While the Plan could have avoided this issue on appeal by expressly acknowledging Dr. Borgmeier's report and explaining why it rejected his conclusion, the fact remains that other medical experts, such as Dr. Buschbacher, reviewed Dr. Borgmeier's report as part of their overall medical records and physical examination review, but reached a different conclusion regarding Ms. Trice's functional abilities.  [R. 1143 (Dr. Buschbacher's report acknowledging Dr. Borgmeier's opinion that Ms. Trice could not work, even at a sedentary level).]  Thus, the Court concludes that the Plan's failure to mention Dr. Borgmeier's report in its denial letter is not indicative of arbitrary and capricious review.

c)   Social Security Decision

Ms. Trice argues that the allegedly arbitrary nature of the Plan's review "is highlighted by its complete failure to reconcile its conclusion with or even recognize the SSA's determination that Ms. Trice is incapable of engaging in gainful employment." [Dkt. 44 at 29.] While Ms. Trice concedes that the Plan was not bound by the SSA's disability finding, she contends that the Plan's failure to consider it suggests arbitrary decisionmaking. [*Id.* (citing case law).]

In response, the Plan emphasizes that the SSA's decision was not binding on it. [Dkt. 51 at 36.] It further contends that much of the evidence on which it relied for its benefits denial was prepared after the SSA decision; thus, it based its conclusion on different evidence than the SSA had before it. [*Id.*]

In her reply, Ms. Trice argues that regardless of any differences in evidence before the Plan and the SSA, the Plan still should have acknowledged the SSA's disability finding and its failure to reconcile its conclusion with the SSA's conclusion is an indicator of arbitrary and capricious review. [R. 52 at 13.]

"An administrator is not forever bound by a Social Security determination of disability, but an administrator's failure to consider the determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom*, 615 F.3d at 772-73. This is especially so when the SSA's determination "was made under a similar or more stringent disability definition" or when the plan administrator encourages the claimant to argue to the SSA that she cannot work, receives benefits for her success, and then ignores the agency's finding in concluding that she can work. *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008)).

The Plan does not deny that Ms. Trice made it aware of the SSA's disability finding before it denied her appeal or that it failed to distinguish that finding in its letter denying her ap-

peal.  While this suggests arbitrary decisionmaking, it is not in and of itself dispositive in this case.  *Holmstrom* and *Glenn* emphasized multiple case-specific factors in concluding that the plans in those cases acted arbitrarily by not distinguishing an SSA disability finding.  Specifically, both courts noted that in those cases, the plan administrators encouraged the claimant to apply for SSA disability benefits, received benefits when the claimant was successful, and then failed to consider that determination when terminating benefits.  *Glenn*, 554 U.S. at 118 (affirming the circuit court's "combination-of-factors method of review" on this issue); *Holmstrom*, 615 F.3d at 772-73.  *Holmstrom* also noted that in that case, the SSA disability determination "was made under a similar or more stringent disability definition."  615 F.3d at 773.

Ms. Trice does not argue that the SSA disability determination was made under a similar or more stringent disability definition.  [Dkts. 44 at 29; 52 at 13.]  Nor does she argue that the Plan encouraged her to apply for SSA disability benefits or that the Plan received any benefits from her successful application.  [*Id.*]  She also ignores the Plan's arguments that the majority of the physician reviews on which it relied were conducted after the SSA decision and, thus, could not have been relied upon by the SSA.  Unlike in *Holmstrom* and *Glenn*, the Plan's failure to acknowledge the SSA decision appears to be more of a benign omission, not a disingenuous attempt to help Ms. Trice get SSA benefits and then ignore them when no longer favorable to the Plan.  Given the Court's previous conclusion that the Plan's denial of benefits has rational support in the record and was not arbitrary and capricious, the Court concludes that its failure to distinguish the SSA's disability finding is not, in and of itself in this case, sufficient to warrant remand.

### B.  Conflict of Interest

The Court has concluded that Ms. Trice's disability claim received a full and fair review. *See* Part III.A, *supra*.  Nevertheless, Ms. Trice argues that the only way to explain the Plan's denial of disability benefits is to conclude that it succumbed to the conflict of interest inherent in every ERISA plan where the same entity is responsible for both determining eligibility and paying benefits.  [Dkt. 44 at 30.]  As support, Ms. Trice cites two arguments that the Court has already rejected—"the complete absence of any medical opinion finding her capable of gainful employment" and a letter from Anthem Life after Dr. Parker's examination that Ms. Trice contends encouraged the Plan to cancel Dr. Buschbacher's examination and approve Ms. Trice's benefits claim.  [*Id.* at 30-31.]

In response, the Plan argues that this case is not a close call that requires resorting to a tiebreaker on the conflict of interest.  [Dkt. 51 at 36-38.]  It points out that it engaged Anthem—a third-party administrator—to assist with claims administration and that Anthem had no responsibility for paying claims.  [*Id.* at 37.]  In fact, the Plan points out that under Anthem's service agreement, it could have earned more fees by approving claims because its fees correlate, in part, to the number of participants receiving benefits.  [*Id.*; dkt. 50-4 at 4.]  Instead, though, Anthem actually recommended that the Plan deny Ms. Trice's claim on January 26, 2011.  [R. 536-38.]  The Plan concludes that because this is not a close case, there is nothing to suggest that a conflict of interest played a role in the Plan's decision.  [Dkt. 51 at 38.]

Ms. Trice reiterates the arguments from her opening brief on reply but ignores the Plan's arguments regarding third-party administrator Anthem.  [Dkt. 52 at 13-14.]

The Court must take a "conflict of interest into account," but the administrator "remains entitled to the deference normally afforded under the arbitrary and capricious standard."  *Black v.*

*Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009).  Because an administrative conflict of interest exists in almost all ERISA cases, the Court must not focus on the existence of the conflict but, instead, on the "gravity" of the conflict.  *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).  This includes reviewing "the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims."  *Id.* (citing *Marrs v. Motorola*, 577 F.3d 783, 789 (7th Cir. 2009)).  The administrator's conflict of interest might prove to be "tiebreaking" in a case where the circumstances suggest a higher likelihood that the conflict affected the benefits decision.  *Glenn*, 554 U.S. at 117.

The Court has already rejected the arguments on which Ms. Trice relies to show that the Plan's inherent conflict of interest resulted in her benefits denial.  Specifically, although Ms. Trice argues that there is a "complete absence of any medical opinion finding her capable of gainful employment," [dkt. 44 at 30], that assertion completely ignores the conclusions of Drs. Kaplan, Payne, Parker, and Buschbacher, detailed at length above, who all found that Ms. Trice could engage in at least sedentary work or, at the very least, that such work was recommended for treating an underlying psychological disorder.  As for Ms. Trice's argument that Anthem sent the Plan a letter after Dr. Parker's examination that she contends encouraged the Plan to cancel Dr. Buschbacher's examination and approve Ms. Trice's benefits claim, [*id.*], the Court has already rejected that argument as an unreasonable interpretation of the Anthem letter.  *See* Part III.A.1, n.4, *supra*.

The Plan cannot, and does not, deny that an administrative conflict of interest exists in almost all ERISA cases.  That said, Ms. Trice has not convincingly argued that the gravity of the

conflict in this case affected the outcome. *Majeski*, 590 F.3d at 482. Specifically, there is no evidence that the Plan used unreasonable procedures to decide Ms. Trice's claim, and Ms. Trice completely ignores that the Plan utilized a third-party administrator as a safeguard to minimize the conflict of interest. The Court does not find Ms. Trice's case to be the type of close case that necessitates relying on the inherent conflict of interest as a tiebreaker. While Ms. Trice argues that the Plan "was determined to continue commissioning medical examination[s] until it got one that opined that Ms. Trice was capable of engaging in gainful employment," [dkt. 44 at 31], the Court has already rejected this argument as an unreasonable interpretation of applicable case law and the record. *See Davis*, 444 F.3d at 575 (a plan administrator's decision to "seek independent expert advice is evidence of a thorough investigation"); *see also* Part III.A.1. Moreover, as a general matter, the Court finds nothing nefarious about a plan administrator returning an insured to a productive life, if possible, particularly considering the duty it has to other plan participants to maintain its financial integrity by, for example, not paying unsupported claims. *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 253 (2008) (noting that ERISA's fiduciary obligations "relat[e] to the plan's financial integrity" and "reflec[t] a special congressional concern about plan asset management"); *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) (emphasizing the importance of "protect[ing] the financial integrity of pension and welfare plans by confining benefits to the terms of the plan as written").

For these reasons, the Court does not find that the Plan got the balance wrong in this case or that its inherent conflict of interest affected its adverse benefits decision regarding Ms. Trice.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court finds that Ms. Trice's disability claim received a full and fair review that was not impacted by the inherent conflict of interest present in almost

all ERISA plan cases.   Accordingly, the Court **DENIES** Plaintiff Darlene Trice's Motion for

Summary Judgment, [dkt. 43], and **GRANTS** Defendant Lilly Employee Welfare Plan's Motion

for Summary Judgment, [dkt. 50].  Judgment will enter accordingly.

12/19/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Briana Lynn Clark
BINGHAM GREENEBAUM DOLL LLP
bclark@bgdlegal.com

Philip John Gutwein II
FAEGRE BAKER DANIELS LLP - Indianapolis
philip.gutwein@FaegreBD.com

Kandi Kilkelly Hidde
BINGHAM GREENEBAUM DOLL LLP
khidde@bgdlegal.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Shana C. Stump
BAKER & DANIELS - Indianapolis
shana.stump@faegrebd.com